IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,003

STATE OF KANSAS,
*Appellee*,

v.

BRIAN S. STUBBS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under the jurisdictional case-or-controversy requirement implicit in the Kansas Constitution's separation of powers, parties must show that they have standing to make a legal claim. To establish standing in Kansas courts, parties must satisfy a two-part test: they must demonstrate both a cognizable injury and a causal connection between the injury and the challenged conduct. How these general principles play out in any given case depends on the legal claim asserted.

2.

Limitations that Kansas courts have applied to bar challenges to statutes that "clearly prohibited" the defendant's conduct and facial challenges generally are not jurisdictional requirements under the Kansas Constitution.

3.

The void-for-vagueness doctrine under the United States Constitution imposes two distinct requirements: (1) due process requires that ordinary people have fair notice of

1

what conduct a statute prohibits, and (2) separation of powers requires that the statute provide adequate standards to prevent arbitrary or discriminatory enforcement by police, prosecutors, and judges.

4.

An arbitrary-enforcement challenge under the void-for-vagueness doctrine rests on separation-of-powers principles. Because the Constitution reserves to the legislature the power to define crimes, a statute lacking adequate enforcement guidelines impermissibly delegates that core legislative function to police, prosecutors, and judges.

5.

Arbitrary-enforcement challenges are inherently facial because they dispute a legislature's authority to enact the statute at all. Such challenges assert that the constitutional violation occurs at enactment—when the legislature creates a standardless statute—not during enforcement. The constitutional defect lies in the excessive discretion the statute grants in every case, not in how officials exercise that discretion in any particular case.

6.

In Kansas courts, a defendant convicted under a statute generally has standing to bring an arbitrary-enforcement challenge against that statute. The conviction itself establishes the cognizable injury, and the causal connection exists because that injury flows directly from the Legislature's enactment of an allegedly void statute.

7.

Defendants who bring arbitrary-enforcement challenges assert their own injury, not third-party interests. Such challenges contest the Legislature's authority to enact the statute at all, making every application of the law—including to the defendant—constitutionally suspect.

8.

Any bar against vagueness challenges to statutes that "clearly prohibited" the defendant's conduct does not apply to arbitrary-enforcement challenges. Such challenges assert the statute was void from enactment for improperly delegating legislative power, and a void statute cannot "clearly prohibit" anything because it has no valid applications.

9.

State courts must follow the United States Supreme Court's interpretation of the United States Constitution.

10.

A criminal statute is not unconstitutionally vague under an arbitrary-enforcement theory merely because officials might sometimes struggle to determine whether particular conduct violates it. Rather, a statute becomes unconstitutionally vague when it fails to define what conduct it prohibits. When statutory terms dissolve into pure discretion, it effectively delegates enforcement decisions to individual officials' judgment. Such standardless delegation violates the requirement that criminal laws provide reasonably clear guidelines to prevent arbitrary and discriminatory enforcement.

11.

K.S.A. 21-6301(a)(2)'s prohibition on "knowingly" possessing a "dangerous knife" with intent to use it "unlawfully against another" provides adequate enforcement guidelines. A dangerous knife is one likely to produce death or serious injury when used as a weapon. This definition and the statute's intent requirement provide reasonably clear guidelines to prevent arbitrary and discriminatory enforcement.

3

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 30, 2023. Appeal from Douglas District Court; BARBARA KAY HUFF, judge. Oral argument held February 2, 2024. Opinion filed June 27, 2025. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, argued the cause, and *Jennifer C. Bates*, of the same office, was with him on the briefs for appellant.

*Jon Simpson*, assistant district attorney, argued the cause, and *Suzanne Valdez*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: The Kansas Constitution's implicit separation of powers demands that courts resolve only genuine controversies between parties with real stakes in the outcome. Kansas courts enforce this constitutional command through several threshold requirements, chief among them standing. To establish standing to bring a legal claim, a party must show both a cognizable injury and a causal connection between the injury and the challenged conduct.

Today we examine how these standing requirements operate when defendants in Kansas courts bring "arbitrary-enforcement challenges" under the United States Constitution. These challenges assert that a criminal statute is unconstitutionally vague because it lacks meaningful standards, which effectively delegates a legislature's core power to define crimes to police, prosecutors, and judges, and invites arbitrary enforcement. The defendant here, Brian Stubbs, brings such a challenge to K.S.A. 21-6301(a)(2), which prohibits possessing a "dangerous knife" with intent to use it "unlawfully against another."

4

The Court of Appeals held that Stubbs lacked standing to bring that claim because he failed to show the statute was vague as applied to his specific conduct. Our court has repeatedly endorsed that result. But we now clarify that this standing requirement is incompatible with the nature of arbitrary-enforcement challenges. When a defendant argues that a legislature has improperly delegated its power to define crimes, the standing inquiry does not focus on the specific facts of enforcement. The constitutional violation, if one exists, occurred when the legislature enacted a standardless statute, rendering all applications of that statute invalid. And Stubbs clearly satisfies our standing requirements: his conviction under an allegedly void statute presents exactly the kind of concrete, traceable injury our doctrine demands.

But our conclusion that Stubbs has standing to bring his constitutional challenge does not guarantee its success on the merits. After careful review, we are not persuaded by Stubbs' arbitrary-enforcement challenge or the other issue he raises on appeal—that insufficient evidence supported his interference-with-law-enforcement conviction. We therefore affirm his convictions.

FACTUAL BACKGROUND

Before their nearly fatal encounter in March 2021, Stubbs and Edward McCutcheon had barely crossed paths. But in the early morning hours, Stubbs arrived uninvited at McCutcheon's apartment and began banging on the door. A fight broke out, during which Stubbs stabbed McCutcheon in the abdomen with a large kitchen knife. Each man would later claim the other started the fight.

McCutcheon made his way out of the apartment and found help from his next-door neighbor, who called the police right away. Stubbs heard approaching sirens as he fled the apartment.

As these events unfolded, an officer arrived on the scene and radioed that someone was running away. Another officer in the area heard the call and spotted Stubbs—who, at that moment, ran directly in front of the officer's patrol car. The officer activated his lights and sirens, jumped out of his car, and yelled, "Stop! Police!"

Stubbs kept running. The officer followed him into an apartment building, where their chase led up several flights of stairs to the top-floor hallway. The pursuit ended only after the officer drew his taser. The whole chase was captured on the officer's body camera, footage that would later be shown to the jury.

The State charged Stubbs with attempted first-degree murder, aggravated burglary, criminal use of weapons, and interference with law enforcement. But the jury was not entirely convinced by the State's theory of the case. It acquitted Stubbs of attempted murder and aggravated burglary, though it found him guilty of criminal use of a weapon, a misdemeanor, and interference with law enforcement, a low-level felony.

On appeal, Stubbs challenged both convictions. His first argument, grounded in our court's decision in *State v. Harris*, 311 Kan. 816, 467 P.3d 504 (2020), claimed that the criminal-use-of-weapons statute was unconstitutionally vague. Stubbs argued that the statute's prohibition on possessing a "dangerous knife" lacked meaningful enforcement standards, which effectively handed too much discretion to police, prosecutors, and judges. His second argument challenged the sufficiency of the evidence supporting his interference-with-law-enforcement conviction. He asserted that the State failed to prove he "knowingly" obstructed an officer's official duties.

A Court of Appeals panel ruled that it lacked jurisdiction on the arbitrary-enforcement claim because Stubbs raised a "facial" attack on the statute rather than an "'as-applied'" challenge to how the statute operated in his specific case. *State v. Stubbs*, No. 125,003, 2023 WL 4284639, at *3 (Kan. App. 2023) (unpublished opinion). These

6

two types of constitutional challenges serve different purposes: a facial challenge contends "that a statute . . . always operates unconstitutionally," while an as-applied challenge argues that "a statute is unconstitutional on the facts of a particular case," even if the law might be valid in other circumstances. Black's Law Dictionary 287 (12th ed. 2024).

The panel's analysis hinged on the types of arguments Stubbs made. Stubbs never argued that the large kitchen knife he possessed fell outside the statute's definition of a "dangerous knife." 2023 WL 4284639, at *3. Instead, as the panel saw it, Stubbs was raising broader questions about how the statute might apply to other kinds of knives—questioning, for instance, how sharp or how long a knife must be to qualify as "dangerous." 2023 WL 4284639, at *3.

This approach troubled the panel because it believed the argument asked them to consider how the statute might operate in hypothetical scenarios rather than focusing on Stubbs' actual circumstances. 2023 WL 4284639, at *3. And our court had rejected such speculative challenges. See, e.g., *State v. Williams*, 299 Kan. 911, 919, 329 P.3d 400 (2014) (A party "'cannot challenge the constitutionality of the statute on the grounds that the statute may conceivably be applied unconstitutionally in circumstances other than those before the court.'").

In an unusual turn, the panel then addressed the merits of Stubbs' claim despite having just concluded that it lacked jurisdiction to do so—a practice our court has discouraged. See *In re Estate of Lentz*, 312 Kan. 490, 504, 476 P.3d 1151 (2020) ("[O]nce a Court of Appeals panel concludes jurisdiction is lacking, the better practice is not to proceed to opine about the merits of the issues."). The panel rejected Stubbs' arbitrary-enforcement argument and found that sufficient evidence supported his interference-with-law-enforcement conviction.

We granted Stubbs' petition for review to examine both the jurisdictional question and the sufficiency of evidence. Oral argument was held on February 2, 2024. We have jurisdiction under K.S.A. 60-2101(b) to review the panel's decision.

ANALYSIS

Stubbs renews his two challenges in our court. First, he argues that the criminal-use-of-weapons statute is unconstitutionally vague because it gives too much discretion to police, prosecutors, and judges to determine what qualifies as a "dangerous knife." Stubbs insists that he has standing because our court addressed the merits of a similar challenge in *Harris*. See 311 Kan. at 507-10. Second, Stubbs disputes that the State proved he "knowingly" obstructed law enforcement. He argues the Court of Appeals drew unsupported conclusions from the arresting officer's bodycam footage.

Both claims warrant careful consideration, but only one involves novel questions. Our framework for reviewing sufficiency-of-evidence claims is well established. But our court has not fully explored how Kansas' standing doctrine applies to arbitrary-enforcement challenges under the United States Constitution (though we touched on the issue in *Harris*). Thus, we devote most of our analysis to the standing issue.

We first examine the Kansas and federal standing doctrines. We then explain why an arbitrary-enforcement challenge is inherently a facial challenge, and we conclude that Stubbs' conviction under the allegedly vague statute gives him standing to pursue his claim. After concluding that we have jurisdiction, we consider and ultimately reject both his vagueness and sufficiency-of-the-evidence challenges.

I. *Stubbs has standing to mount a facial challenge to the criminal-use-of-weapons statute under an arbitrary-enforcement theory.*

    A. *The Kansas standing doctrine differs from the federal one.*

Courts cannot entertain just any challenge to a statute. The Kansas Constitution, through its implicit separation of powers, limits a court's exercise of judicial power to actual cases or controversies. *Gannon v. State*, 298 Kan. 1107, 1119, 319 P.3d 1196 (2014). And under this jurisdictional case-or-controversy requirement, parties must show (among other things) that they have standing—the "'right to make a legal claim'" before the court. 298 Kan. at 1121.

To establish standing in Kansas courts, parties must satisfy a two-part test: they must demonstrate both a "'cognizable injury'" and "'a causal connection between the injury and the challenged conduct.'" *League of Women Voters of Kansas v. Schwab*, 317 Kan. 805, 813, 539 P.3d 1022 (2023). A cognizable injury exists when a party has suffered or faces an actual or threatened injury from the challenged conduct. 317 Kan. at 813. How these general principles play out in any case depends on the legal claim asserted. Compare *State v. Talkington*, 301 Kan. 453, 476, 345 P.3d 258 (2015) (standing to challenge government search requires privacy interest in searched item), with *League of Women Voters*, 317 Kan. at 814 (standing to bring pre-enforcement constitutional challenge requires credible threat of prosecution).

The panel's standing analysis, while acknowledging these general principles, turned primarily on its application of other principles we have applied to vagueness challenges. The panel explained that a defendant lacks standing to raise a vagueness challenge in two situations: when the statute "clearly prohibited" the defendant's conduct, and when the vagueness challenge focuses solely on how the statute might affect

others rather than the defendant's own circumstances. *Stubbs*, 2023 WL 4284639, at *3. The panel also said that defendants cannot bring facial vagueness challenges. They are limited to as-applied challenges only. 2023 WL 4284639, at *3.

Applying these principles, the panel concluded that Stubbs lacked standing because he did not raise an as-applied challenge—that is, he never claimed that the large kitchen knife he used fell outside the statute's definition of "dangerous knife." Instead, the panel viewed his argument as a facial challenge focused on how the standard might apply to different kinds of knives in hypothetical cases. 2023 WL 4284639, at *3.

The panel's reliance on these additional standing requirements is understandable. After all, our court has recited and applied them many times. See, e.g., *State v. Bodine*, 313 Kan. 378, 385, 486 P.3d 551 (2021); *Williams*, 299 Kan. at 918; *State v. Brown*, 280 Kan. 898, 899, 127 P.3d 257 (2006). But closer examination reveals tension between these requirements and other aspects of our standing doctrine.

The two-part standing test described above—requiring both a cognizable injury and a causal connection to the challenged conduct—is jurisdictional. Kansas courts lack constitutional authority to hear a case unless both elements are present. *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 677-79, 359 P.3d 33 (2015). The additional requirements the panel applied, in contrast, are not constitutional barriers to exercising judicial power.

Our court appears to have imported these vagueness-specific limits to standing from federal caselaw. See, e.g., *State v. Brown*, 305 Kan. 674, 698, 387 P.3d 835 (2017) ("'We consider whether a statute is vague as applied to the particular facts at issue.'") (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 [2010]); *Williams*, 299 Kan. at 918 ("'[I]f there is no constitutional defect in the application of the statute to a litigant, [the litigant] does not have standing to argue

that it would be unconstitutional if applied to third parties in hypothetical situations.'") (quoting *Ulster County Court v. Allen*, 442 U.S. 140, 155, 99 S. Ct. 2213, 60 L. Ed. 2d 777 [1979]).

Federal courts, like Kansas courts, operate under jurisdictional standing requirements. Like our two-part test, the federal doctrine requires parties to show concrete harm and causation. It also requires parties to show a likelihood that a favorable decision would redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

But federal courts supplement these jurisdictional standing requirements with other prudential limits. Unlike jurisdictional standing requirements—which are mandatory rules rooted in the United States Constitution that limit the federal courts' judicial power—the prudential limits are discretionary rules that help federal courts decide whether to exercise such power, even when they have constitutional authority to do so. See *Secretary of State of Md. v. J. H. Munson Co.*, 467 U.S. 947, 955, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984) ("In addition to the limitations on standing imposed by Art. III's case-or-controversy requirement, there are prudential considerations that limit the challenges courts are willing to hear."). These prudential limits generally prevent plaintiffs from asserting third-party rights, from raising "a general [grievance] shared by a large class of citizens," and from pursuing interests outside "the zone of interests protected by statutory or constitutional guarantee." *Kansas Bldg. Industry*, 302 Kan. at 679. The extra standing limits the panel applied below come from this prudential category of federal standing rules.

But standing is governed by Kansas law, and "[t]he test for standing in Kansas differs from the federal standard." See *League of Women Voters*, 317 Kan. at 813; *Kansas Bldg. Industry,* 302 Kan. at 679-80. Though we have sometimes referenced federal constitutional standing requirements, we have maintained the independence of our

11

traditional two-part standing test. 302 Kan. at 680 ("Given the differences in the genesis of the two systems, we do not feel compelled to abandon our traditional two-part analysis as the definitive test for standing in our state courts."). And notably, our court has said that prudential standing requirements are "self-imposed judicial restraints" that "apply only to the exercise of federal courts' jurisdiction." 302 Kan. at 679. These circumstances call into question a court's reliance on federal prudential rules when resolving a party's standing in Kansas courts. After all, we have never explicitly adopted a prudential standing doctrine, nor explained its role in a Kansas standing analysis.

But we need not resolve these doctrinal questions today. As we explain below, Stubbs has alleged precisely the kind of traceable injury that our traditional two-part standing test requires. And the constitutional underpinnings of arbitrary-enforcement challenges render these prudential standing constraints inapplicable. We begin by examining these constitutional underpinnings in detail.

B.  *Stubbs has standing under Kansas law to bring an arbitrary-enforcement challenge to K.S.A. 21-6301(a)(2).*

While Kansas law governs standing, Stubbs' vagueness challenge arises under the United States Constitution, so federal law governs the substance of his claim. See *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 1, 297 P.3d 1164 (2013) ("The United States Supreme Court's interpretation of the United States Constitution is controlling upon and must be followed by state courts."). The vagueness doctrine, as the Supreme Court has explained, "rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 588 U.S. 445, 451, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019). These pillars establish two distinct constitutional requirements. A statute must satisfy due process by giving "ordinary people . . . 'fair notice' of the conduct a statute proscribes." But it must also respect separation of powers by "provid[ing] standards to govern the

actions of police officers, prosecutors, juries, and judges" to prevent "arbitrary or discriminatory" enforcement. *Sessions v. Dimaya*, 584 U.S. 148, 156, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018).

Stubbs' vagueness challenge focuses solely on the second requirement. He does not argue that the statute fails to provide fair notice. Rather, he contends that K.S.A. 21-6301(a)(2)'s prohibition on possessing a "dangerous knife" lacks meaningful enforcement standards, effectively allowing police, prosecutors, and judges to define what conduct is criminal. This type of claim has come to be known as an arbitrary-enforcement challenge. See, e.g., *In re A.B.*, 313 Kan. 135, 139, 484 P.3d 226 (2021); *United States v. Melgar-Diaz*, 2 F.4th 1263, 1270 (9th Cir. 2021); *United States v. Watzman*, 486 F.3d 1004, 1009 (7th Cir. 2007); *State v. Jodi D.*, 340 Conn. 463, 483, 264 A.3d 509 (2021).

As the United States Supreme Court and our court have explained, the foundation of due-process arbitrary-enforcement challenges is the separation-of-powers doctrine. *Davis*, 588 U.S. at 451; *Dimaya*, 584 U.S. at 156 (plurality opinion); *Dimaya*, 584 U.S. at 181-83 (Gorsuch, J., concurring in part and concurring in the judgment); *Harris*, 311 Kan. at 821-22. The United States Constitution reserves the power to define criminal conduct to "the people's elected representatives in the legislature." *Davis*, 588 U.S. at 451. A statute that fails to provide adequate enforcement guidelines effectively transfers the "responsibility for defining crimes" to "police, prosecutors, and judges." *Davis*, 588 U.S. at 451. This "impermissible delegation of legislative power," as we explained in *Harris*, allows these nonlegislative officials to enforce the law arbitrarily "based on subjective or even prejudicial criteria." *Harris*, 311 Kan. at 822; see *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972) (explaining that due process is violated when a standardless law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"); *United States v. Ross*, 948 F.3d 243, 247 (5th Cir. 2020) (recognizing that due-

process vagueness doctrine incorporates separation-of-powers principles); *United States v. Matchett*, 837 F.3d 1118, 1124 (11th Cir. 2016) (acknowledging that "one of the main concerns behind arbitrary enforcement is the separation of powers").

Without "'minimal guidelines to govern law enforcement,'" a criminal statute may permit "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983). And as the Supreme Court warned nearly 150 years ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government." *United States v. Reese*, 92 U.S. 214, 221, 23 L. Ed. 563 (1875).

But to be clear, while a defendant bringing such a challenge argues that the statute's lack of standards invites the possibility of arbitrary or discriminatory enforcement—they need not allege that officials actually enforced the statute arbitrarily in their case. See *Copeland v. Vance*, 893 F.3d 101, 120 (2d Cir. 2018) ("[A] pattern of discriminatory enforcement, without more, would not show that the statute is unconstitutionally vague. What makes a statute unconstitutionally vague is that the statute, as drafted by the legislature and interpreted by the courts, *invites* arbitrary enforcement."). In other words, such a statute is unconstitutional "not because [the executive or judicial authority] applied this discretion wisely or poorly in a particular case, but rather because [the authority] enjoys too much discretion in every case." *Chicago v. Morales*, 527 U.S. 41, 71, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999) (Breyer, J., concurring in part and concurring in the judgment). Any constitutional violation inheres in the legislative act itself—the creation of a standardless statute—making it void from the start, and the specific facts of enforcement generally do not bear on whether that violation occurred.

With this doctrinal foundation in mind, Stubbs easily satisfies our traditional two-part standing test. Recall that he must show both a cognizable injury and a causal connection to the challenged conduct. Here, Stubbs alleges he was convicted and imprisoned under a statute that the Legislature lacked constitutional authority to enact. This presents exactly the kind of concrete injury our standing doctrine requires—and that injury flows directly from the challenged conduct, the Legislature's enactment of an allegedly void statute.

And given this doctrinal foundation, even if we disregard our concerns about the validity of prudential standing constraints and their application in Kansas courts, these constraints simply do not apply to arbitrary-enforcement challenges. Specifically, the panel relied on three prudential constraints to deny standing. First, it held that vagueness challenges must be as-applied rather than facial. Second, it concluded that defendants cannot rely on hypothetical third-party applications rather than their own injury. And third, it found that defendants whose conduct "clearly" violates a statute cannot challenge it as vague. *Stubbs*, 2023 WL 4284639, at *3. We examine each conclusion in turn.

First, the panel misunderstood the nature of Stubbs' challenge. When defendants argue that a statute impermissibly delegates the authority to define crimes, they necessarily present a facial challenge because they dispute a legislature's authority to enact the statute at all. See Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1275-76 (2010) ("[A] claim that Congress violated the Constitution by making a law, when it made the law, is inherently a 'facial' challenge."); Fallon, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1321 (2000) ("[R]ulings that a statute is facially [or partly] invalid are the consequence of the particular doctrinal tests that courts apply to resolve particular cases. Some doctrinal tests call for statutes to be tested on their faces, whereas others do not."). Such challenges, by definition, cannot be as-applied. The constitutional violation—if one exists—occurs

15

when a legislature enacts a standardless statute, not when officials enforce it in a particular way. The specific facts of any enforcement are beside the point when it comes to jurisdiction. See 62 Stan. L. Rev. at 1276 ("The specific facts of enforcement cannot matter here, for the simple reason that the constitutional violation is complete before those facts arise.").

Second, Stubbs is not raising third-party interests in hypothetical cases. Instead, he claims a direct, personal injury. When defendants raise an arbitrary-enforcement claim, they challenge every application of that law—including its application to them. See *Morales*, 527 U.S. at 71 (Breyer, J., concurring in part and concurring in the judgment). So Stubbs does not rest his claim on hypothetical scenarios. He alleges that he was convicted and imprisoned under a statute that the Legislature lacked constitutional authority to enact.

And third, the panel's conclusion that Stubbs lacks standing because the statute "clearly prohibited" his conduct cannot be reconciled with the nature of an arbitrary-enforcement challenge. Stubbs contends that the statute was void from the moment of enactment because it improperly delegated the authority to define what conduct is criminal. A void statute cannot "clearly prohibit" anything—it has no valid applications at all. See *Act Now to Stop War v. Dist. of Columbia.*, 846 F.3d 391, 410 (D.C. Cir. 2017) ("[I]t is not apparent how the *Humanitarian Law Project* rule—barring a person to whom a legal provision clearly applies from challenging its facial failure to give sufficient notice to others . . .—could apply to a claim that a law is so vague as to fail to guide the government's enforcement discretion."). Whether the statute "clearly prohibited" Stubbs' conduct might be relevant when we assess the merits of his claim. It could suggest, for instance, that the Legislature provided adequate guidelines rather than impermissibly delegating its authority. But that inquiry belongs at the merits stage.

C. *Our standing analysis finds support in other courts' treatment of arbitrary-enforcement claims and similar structural challenges.*

While standing is governed by Kansas law, our analysis aligns with how other courts have approached the issue. The United States Supreme Court has treated arbitrary-enforcement challenges as facial challenges and reached the merits of such claims. See *Morales*, 527 U.S. at 45-46, 52-53 (plurality opinion) (reviewing facial challenge of Chicago ordinance prohibiting "'criminal street gang members' from 'loitering' with one another" in any public place); *Kolender*, 461 U.S. at 353, 358 n.8 (reviewing facial challenge to California statute requiring "persons who loiter or wander on the streets to provide 'credible and reliable' identification and to account for their presence"). The United States Court of Appeals for the D.C. Circuit has too. See *Act Now*, 846 F.3d at 409-12.

So has the Minnesota Supreme Court. See *State v. Ness*, 834 N.W.2d 177, 184, n.5 (Minn. 2013) ("Because Ness bases his vagueness claim on arbitrary and discriminatory enforcement, we will assume that his claim is a proper facial challenge and will proceed on the merits.") (citing Goldsmith, *The Void-for-Vagueness Doctrine in the Supreme Court, Revisited*, 30 Am. J. Crim. L. 279, 311 [2003]); 30 Am. J. Crim. L. at 311 ("[T]he arbitrary enforcement prong suggests facial review. If a statute allows or encourages arbitrary or discriminatory law enforcement, it will do so through its text and history.").

The United States Supreme Court's decision addressing a similar structural challenge in *Bond* is especially instructive. See *Bond v. United States*, 564 U.S. 211, 217-26, 131 S. Ct. 2355, 180 L. Ed. 2d 269 (2011). There, the defendant had been convicted under a federal statute criminalizing the use of chemical weapons after she spread chemicals on surfaces her neighbor was likely to touch. See 18 U.S.C. § 229(a)(1). Bond brought a facial constitutional challenge to the statute. She did not argue that the statute was invalid as applied to her conduct. Instead, she argued that Congress lacked authority

to enact it at all because it exceeded Congress' enumerated powers and encroached on powers that the Tenth Amendment reserves to the states. See U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). The federal appellate court ruled that Bond lacked standing. *United States v. Bond*, 581 F.3d 128, 137 (3d Cir. 2009).

The Supreme Court reversed. The Court first held that Bond easily satisfied Article III jurisdictional standing requirements because "'incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction.'" *Bond*, 564 U.S. at 217. The Court then rejected arguments that prudential standing principles barred her challenge. Specifically, it disagreed that Bond improperly relied on "the legal rights or interests of third parties" by raising a Tenth Amendment separation-of-powers claim. 564 U.S. at 220. Though Bond invoked constitutional limits on federal power rather than individual rights, the Court held she was "seek[ing] to vindicate her own constitutional interests" by challenging "action taken in excess of the authority that federalism defines." 564 U.S. at 220. "If the constitutional structure of our Government that protects individual liberty is compromised," the Court concluded, "individuals who suffer otherwise justiciable injury may object." 564 U.S. at 223. Stubbs' challenge here is no different in principle and merits similar consideration.

The Supreme Court has also addressed the merits of facial challenges that closely resemble the arbitrary-enforcement theory. For example, litigants sometimes raise challenges under the nondelegation doctrine, which "bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 588 U.S. 128, 132, 139 S. Ct. 2116, 204 L. Ed. 2d 522 (2019). And they sometimes raise challenges under the Commerce Clause, which gives Congress the power to "regulate Commerce with foreign Nations, among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. These challenges, like arbitrary-enforcement claims, assert

18

that the Congress exceeded, or acted contrary to, its constitutional authority in enacting the law. In all such cases, the alleged defect renders the statute void from its inception, not merely in its application. See 62 Stan. L. Rev. at 1275-76 ("[I]f Congress makes a law in excess of its power under the Commerce Clause and thus violates the Tenth Amendment, the constitutional violation occurs when Congress makes the law" and the claim "is inherently a 'facial' challenge.").

The Supreme Court's approach to such challenges is telling. In these contexts, the Court has addressed the merits without demanding litigants show how the provision was applied in their specific case. See *Gundy*, 588 U.S. at 148 (addressing merits of nondelegation challenge to provision of the federal Sex Offender Registration and Notification Act authorizing Attorney General to specify applicability of registration requirements to certain offenders); *United States v. Morrison*, 529 U.S. 598, 619, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) (holding that Congress lacked authority to enact Violence Against Women Act under the Commerce Clause); *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995) (holding that Congress lacked authority to enact the Gun-Free School Zones Act under the Commerce Clause); *Whitman v. American Trucking Assns, Inc.*, 531 U.S. 457, 472, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001) (addressing merits of nondelegation challenge to Clean Air Act's delegation of authority to set national ambient air quality standards to EPA administrator). Implicit in such an approach is the recognition that the alleged constitutional defect inheres in the enactment itself, not its application.

In sum, we conclude that Stubbs has standing to bring his constitutional challenge. He meets our traditional standing requirements by alleging a concrete injury traceable to the challenged conduct—conviction and imprisonment under an allegedly void statute. Moreover, even if the prudential standing constraints the panel applied have continuing validity in Kansas courts, they have no application to arbitrary-enforcement challenges.

19

When defendants bring an arbitrary-enforcement challenge to the statute they have been convicted under, they necessarily present a facial challenge and assert their own injury. And the ways other courts have confronted arbitrary-enforcement claims and similar structural challenges offer persuasive support for our analysis.

We therefore will shortly turn to whether K.S.A. 21-6301(a)(2)'s prohibition on possessing a "dangerous knife" provides adequate standards to guide enforcement or, as Stubbs contends, impermissibly delegates that responsibility to nonlegislative officials. But before doing so, we must briefly respond to a point raised by the dissent.

We cannot accept the dissent's policy rationale for denying review based on prudential concerns. The dissent fears opening floodgates to a deluge of arbitrary-enforcement claims. But if Stubbs is correct, he stands convicted under a statute the Legislature had no constitutional authority to enact. When citizens properly invoke our jurisdiction to address claims of unconstitutional treatment, they deserve to have those claims heard on the merits. Courts have a duty to consider such claims, not to close the courthouse door through discretionary barriers.

II. *The challenged portion of the criminal-use-of-weapons statute does not invite arbitrary or discriminatory enforcement.*

Stubbs raises an arbitrary-enforcement challenge to a portion of the criminal-use-of-weapons statute, K.S.A. 21-6301. The relevant portion of that statute criminalizes "knowingly . . . possessing" certain weapons "with intent to use" the weapon "unlawfully against another." K.S.A. 21-6301(a)(2). That list of weapons contains various bladed and blunt weapons, including a "dagger," "billy," "dangerous knife," or "any other dangerous or deadly weapon or instrument of like character":

20

"(a) Criminal use of weapons is knowingly:

. . . .

(2) possessing with intent to use the same unlawfully against another, a dagger, dirk, billy, blackjack, slungshot, dangerous knife, straight-edged razor, throwing star, stiletto or any other dangerous or deadly weapon or instrument of like character." K.S.A. 21-6301(a)(2).

Stubbs' challenge focuses on the statute's prohibition of possessing a "dangerous knife," a term the Legislature left undefined. In his view, a prohibition on possessing a "dangerous knife" lacks meaningful standards to guide enforcement.

How should we evaluate that claim? Arbitrary-enforcement challenges share common ground with the nondelegation doctrine—both target situations where the Legislature improperly delegates its core responsibilities to other government actors. See *Davis*, 588 U.S. at 451; *Harris*, 311 Kan. at 822. But while this connection is instructive, it cannot control our analysis. As we already noted, arbitrary-enforcement challenges arise under the United States Constitution, so federal precedent must guide our review. See *Lawson*, 296 Kan. 1084, Syl. ¶ 1. And federal courts have not extended nondelegation principles (such as the intelligible-principle standard) to arbitrary-enforcement claims.

Though the Supreme Court has not precisely defined the boundaries of arbitrary-enforcement challenges, federal precedent illuminates key principles for our analysis. The Court acknowledges certain practical realities: language cannot achieve "'mathematical certainty,'" and enforcement inevitably requires "'some degree of police judgment.'" *Hill*

*v. Colorado*, 530 U.S. 703, 733, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110, 114, 92 S. Ct. 2294, 33 L. Ed. 2d 222 [1972]).

But where does permissible discretion end and the risk of arbitrary or discriminatory enforcement begin? The answer lies not in whether officials might sometimes struggle to apply the law, but in whether they can discern what the law prohibits in the first place:  "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). When statutory terms dissolve into pure discretion—as with prohibitions on "'annoying'" conduct or presence without "'apparent purpose'"—enforcement necessarily "devolves upon an individual law enforcement officer's whim." *Copeland*, 893 F.3d at 120 (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614, 91 S. Ct. 1686, 29 L. Ed. 2d 214 [1971], and *Morales*, 527 U.S. at 60-64). Such standardless delegation violates the core requirement that criminal laws "'set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement."'" *Act Now*, 846 F.3d at 410 (quoting *Smith v. Goguen*, 415 U.S. 566, 573, 94 S. Ct. 1242, 39 L. Ed. 2d 605 [1974]).

This framework guides our analysis of Stubbs' claim that the term "dangerous knife" lacks meaningful enforcement standards. A prior Court of Appeals decision, *State v. Moore*, examined this same statutory language when considering a vagueness challenge to an earlier version of the criminal-use-of-weapons statute. 38 Kan. App. 2d 980, 985-87, 174 P.3d 899 (2008). Drawing from both our definition of "deadly weapon" in aggravated-battery cases and a legal encyclopedia, the *Moore* panel concluded that a dangerous knife is "a 'knife that is likely to produce death or serious injury when used as a weapon.'" 38 Kan. App. 2d at 986; see *State v. Bowers*, 239 Kan. 417, Syl. ¶ 1, 721

P.2d 268 (1986) ("The definition of a deadly weapon for purposes of the aggravated battery statute, . . . is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury."). But as Stubbs correctly observes, *Moore* addressed only whether the statute provided fair notice, not whether it invited arbitrary enforcement.

Stubbs contends that under *Moore*'s definition—a knife "likely to produce death or serious injury when used as a weapon"—almost any knife would qualify as dangerous. 38 Kan. App. 2d at 986. Any knife sharp enough to fulfill its basic cutting purpose, he points out, could cause serious injury if used as a weapon. Though the Legislature apparently intended to criminalize only certain knives, the term "dangerous" provides no real limitation. Instead, Stubbs argues, the statute leaves police, prosecutors, and juries to decide for themselves which knives are "dangerous enough" to trigger criminal liability, creating the risk of arbitrary enforcement that the vagueness doctrine aims to prevent.

Stubbs finds support for his position in *Harris*, where we examined a statute prohibiting felons from possessing a "'dagger, dirk, switchblade, stiletto, straight-edged razor or any other dangerous or deadly cutting instrument of like character.'" *Harris*, 311 Kan. at 816. The defendant's conviction in that case hinged on the residual clause— "'other dangerous or deadly cutting instrument of like character'"—because he had not possessed any of the specifically listed weapons. Our court found no "sufficiently objective standard" for determining what qualified under that language. 311 Kan. at 824. Or, to borrow the Supreme Court's formulation, the statute's fatal flaw was "not the possibility that it will sometimes be difficult to determine" whether a particular weapon was a "'dangerous or deadly cutting instrument of like character'" but rather "the indeterminacy of precisely what" a "'dangerous or deadly cutting instrument of like character'" was. See *Williams*, 553 U.S. at 306; *Harris*, 311 Kan. at 824-25. This indeterminacy, we concluded, impermissibly delegated the legislative task to the subjective judgment of police, prosecutors, and judges. 311 Kan. at 825-26.

But comparing these cases reveals the flaw in Stubbs' argument. *Harris* turned on the vagueness of the statute's residual clause—the lack of any reasonably clear guidelines to determine whether weapons were "'dangerous or deadly cutting instrument of like character'" to those specifically listed. 311 Kan. at 824-25. Stubbs presents a fundamentally different challenge. He argues that *Moore*'s definition of a dangerous knife as one "'likely to produce death or serious injury when used as a weapon'" sweeps too broadly by encompassing virtually all knives. 38 Kan. App. 2d at 986.

But that is not a vagueness problem. The Legislature may have cast a wide net, but the standards for what conduct falls within that net remain clear, and they do not rely on any purely subjective element. Stubbs' real quarrel lies with the Legislature's policy judgment about how much conduct to criminalize, not with any failure to provide explicit enforcement standards. And his concern about selective enforcement under such a broad statute, while serious, may implicate equal protection but not vagueness. See *Copeland*, 893 F.3d at 120 ("Evidence that the defendants target certain classes of people over others, or certain types of retailers over others, would certainly be relevant to an equal protection claim. However, because plaintiffs only advance a vagueness claim, we express no view on whether the defendants' enforcement priorities are consistent with the Equal Protection Clause.").

Stubbs' arbitrary-enforcement argument also glosses over the statute's explicit standards beyond the term "dangerous knife." K.S.A. 21-6301(a)(2) does not criminalize mere possession. Instead, it requires both that defendants "knowingly" possess the dangerous knife and that they do so with the "intent to use" it "unlawfully against another." These scienter requirements provide meaningful constraints on enforcement discretion. See *Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 499, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982) ("[A] scienter requirement may mitigate a law's vagueness.").

24

In sum, K.S.A. 21-6301(a)(2) contains sufficiently explicit standards to prevent arbitrary enforcement. The *Moore* definition of "dangerous knife" and the statute's intent requirement provide reasonably clear constraints on enforcement discretion. And as a result, the Legislature has not impermissibly delegated its core responsibility for defining criminal conduct to other branches of government, contrary to separation-of-powers principles.

III. *Sufficient evidence supports Stubbs' interference-with-law-enforcement conviction.*

We turn finally to whether sufficient evidence supported Stubbs' conviction for interfering with law enforcement. Our review of such challenges follows well-established principles: we examine all trial evidence in the light most favorable to the State, asking whether a reasonable juror could have found each element proven beyond a reasonable doubt. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). This standard requires us to respect the jury's role in weighing credibility and resolving evidentiary conflicts. 313 Kan. at 209.

Stubbs' conviction rests on K.S.A. 2020 Supp. 21-5904(a)(3), which prohibits "knowingly obstructing" an officer performing official duties. His challenge focuses narrowly on the mental state element—whether he acted "knowingly." Stubbs concedes that the pursuing officer was performing official duties and that the flight seriously impeded those duties. He argues instead that the State failed to prove he actually heard any police commands or knew officers had ordered him to stop. He insists he ran purely from shock and trauma. And he complains that the Court of Appeals overstated the bodycam evidence.

The record tells a different story. Several circumstances, taken together, provided the jury an ample basis to conclude Stubbs knowingly obstructed law enforcement. See *State v. Shields*, 315 Kan. 814, 826-27, 511 P.3d 931 (2022) (circumstantial evidence alone can support a conviction for any offense if it allows the fact-finder to find each element proven beyond a reasonable doubt). Testimony established that Stubbs knew police had been called, though his account of how he learned this differed from other witnesses. He heard sirens and saw flashing lights. The officer testified that Stubbs ran directly in front of his patrol car as he activated his lights and siren. The officer stepped out and commanded, "Stop! Police!"—a moment captured on body camera footage along with Stubbs' continued flight. A reasonable juror, viewing this chain of events in the light most favorable to the State, could readily reject Stubbs' explanation and conclude he knew exactly what he was doing: running from law enforcement.

This case required us to resolve three issues. First, we addressed whether defendants have standing to bring facial vagueness challenges under an arbitrary-enforcement theory. We disagreed with the Court of Appeals and concluded that they generally do—an arbitrary-enforcement challenge is inherently facial because it disputes the Legislature's authority to enact the statute at all, and a conviction under such an allegedly void statute presents exactly the kind of concrete injury our standing doctrine requires. Second, we turned to the merits of that claim and held that K.S.A. 21-6301(a)(2)'s prohibition on possessing a "dangerous knife" with the "intent to use" it "unlawfully against another" provided sufficiently concrete enforcement standards to survive constitutional scrutiny. Third, we concluded that the State presented ample evidence for a reasonable juror to find that Stubbs knowingly obstructed law enforcement. We therefore affirm both convictions.

Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

\* \* \*

BILES, J., concurring in part and dissenting in part:  I agree Brian Stubbs should be denied relief. I write separately because I disagree with the majority's path to its outcome because the majority uproots precedent to allow Stubbs to facially challenge the criminal-use-of-weapons statute as vague, even though that statute clearly prohibited his conduct. Granted, the majority's result still pulls the rug out from under Stubbs by rejecting his argument on the merits. But the point remains that the majority kneecaps longstanding precedent by addressing an issue not before us to open a robust new way for litigants to challenge legislative enactments.

Before now, Kansas courts consistently refrained from addressing a criminal statute's validity when a defendant challenged their conviction if that statute clearly prohibited their conduct. See, e.g., *State v. Williams*, 299 Kan. 911, 918, 329 P.3d 400 (2014); *Hearn v. City of Overland Park*, 244 Kan. 638, 639, 772 P.2d 758 (1989). That should have easily ended the discussion on this issue. Instead, the majority needlessly crafts a new rule that will have courts considering more meritless attacks against our criminal laws anytime someone claims a statute is vague. See slip op. at 12.

It is also confusing how the majority decides arbitrary enforcement challenges are inherently facial by reasoning that statutory vagueness somehow means the Legislature exceeded its constitutional authority *from the outset*. See slip op. at 14, 18. In our state, the Kansas Legislature possesses the inherent power to criminalize an act, even when it passes a statute that violates the Due Process Clause. See *State v. Genson*, 316 Kan. 130, 137-40, 513 P.3d 1192 (2022) ("The Legislature has broad authority to craft criminal laws. . . . Yet the Legislature's authority to craft laws remains subject to constitutional constraints."). And for that reason, I cannot grasp how the majority's cited caselaw, which

27

interprets the limited powers of Congress under the Commerce Clause and the Tenth Amendment, pertains in any way to the Kansas Legislature. See slip op. at 18-19.

After all, in the federal system, Congress can only exercise powers enumerated in the United States Constitution and cannot act beyond them, so any action exceeding its constitutional authority is void from the beginning. That's why a criminal defendant convicted under a federal statute has standing to facially challenge its validity when Congress enacted it by violating principles of federalism in a constitutional overreach. See *Bond v. United States*, 564 U.S. 211, 214, 131 S. Ct. 2355, 180 L. Ed. 2d 269 (2011) ("Congress *exceeded* its powers under the Constitution, thus *intruding upon the sovereignty and authority of the States*." [Emphases added.]). Said more plainly, a claim that disputes the federal legislature's authority to enact a federal statute is an entirely different animal than one that challenges whether an enacted state statute provides sufficient due process.

And even setting that aside, if the Legislature passed a law that violates due process, how did that implicate the separation of powers doctrine as the majority insists? Did it intrude on the powers of the executive or the judiciary? No. Here, the Legislature used its lawmaking authority to enact the statute that criminalizes Stubbs' conduct. See *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 883, 179 P.3d 366 (2008) ("'The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law.'"). Unlike the majority, I find no reason to depart from our precedent. See *State v. Reynolds*, 319 Kan. 1, 9, 552 P.3d 1 (2024) ("'Stare decisis is not a rigid inevitability but a prudent governor on the pace of legal change. A court of last resort will follow that rule of law unless clearly convinced it was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.'").

Finally, let me explain why I am not joining Justice Standridge's separate opinion even though we reach the same conclusion—prudential standing urges us not to consider the issue's merits. In my dissent in *State v. Phipps*, No. 125,269, this day decided, I analyzed the Kansas Constitution's explicit text, which demands trial and appellate courts' jurisdiction be based on statute and concluded we must base any jurisdictional inquiry on the relevant statute. As I see it, our Constitution gives the Legislature the power to define jurisdiction over criminal matters, so assertions in our caselaw about limitations on the exercise of judicial authority are simply judge-made prudential doctrines, not jurisdictional limits. This is why I bristle when others characterize cases like *Morrison*, 285 Kan. 875, Syl. ¶ 15, as setting a constitutional test for standing, rather than simply acknowledging that its decision, like so many others, arises from the court's prudential concerns.

After all, if *Morrison* limits our jurisdiction to only those circumstances when a person alleges a cognizable injury causally connected to a challenged conduct, then there cannot be any exceptions like those considering certified questions submitted by other courts under K.S.A. 60-3201 or broadening the range of reviewable questions for third-party claims under K.S.A. 2024 Supp. 60-217. See *Stroud v. Ozark Nat'l Life Ins. Co.*, 320 Kan. 180, 187, 564 P.3d 725 (2025) ("While a third-party representative listed in K.S.A. 2024 Supp. 60-217[a] may bring the action, others may have a substantive right to recover."). Furthermore, under Justice Standridge's view of standing, a party will never establish their standing in cases like *City of Wichita v. Griffie*, 318 Kan. 510, Syl. ¶ 2, 544 P.3d 776 (2024) ("The First Amendment facial overbreadth doctrine departs from the traditional rule of standing that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court.").

These are just a few examples of what used to be routine circumstances in which Kansas courts have exercised jurisdiction that will be lost. See slip op. at 34 (Standridge, J., concurring in part and dissenting in part). Relaxed rules made by either the judiciary

or the Legislature cannot govern if *Morrison* is jurisdictional, but if standing under *Morrison* is prudential, then other prudential rules or statutory directions can justify a lessened standard.

For these reasons, I concur in part and dissent in part.

* * *

STANDRIDGE, J., concurring in part and dissenting in part:  I agree with the majority that Brian Stubbs' sufficiency-of-the-evidence challenge fails on the merits, and I join that portion of the opinion in full. But I disagree with the majority's decision to depart from decades of our vagueness precedent from this court to entertain Stubbs' facial challenge alleging that the criminal-use-of-weapons statute is vague because it invites arbitrary enforcement. This decision treats "standing" solely as a jurisdictional issue and ignores the important role that prudential rules serve in our broader standing doctrine, particularly when reviewing federal constitutional challenges like vagueness claims.

After concluding that Stubbs satisfies *jurisdictional* standing by the fact of his criminal conviction, the majority immediately moves to consider the merits of his facial vagueness challenge. But our precedent, like that of the United States Supreme Court, has rejected facial challenges under these circumstances—when a defendant's conduct is clearly proscribed by the challenged law and is not constitutionally protected. This *prudential* rule aligns with the federal vagueness doctrine and serves important state legal and policy interests, including judicial economy, separation of powers, and the prevention of advisory opinions. I would continue to apply this rule, which is embedded in our precedent. Therefore, I dissent.

To understand why we should retain prudential standing rules in vagueness challenges, I begin my analysis by tracing our standing requirement as it evolved from

30

prudential and common law limits on a party's right to bring a legal claim to a mandatory jurisdictional requirement. Next, I discuss our established approach to standing in constitutional challenges generally and vagueness specifically, which incorporates both jurisdictional and prudential components. Finally, I argue this approach—which aligns with federal law—effectively safeguards the due process interests at stake in a vagueness challenge while ensuring our decisions to void a state law using this federal doctrine are based on the concrete facts before us, unless constitutional implications warrant wider judicial review.

I.   *Evolution of the Kansas standing requirement*

The modern notion of standing as a jurisdictional requirement in Kansas is relatively new. Standing was originally a prudential and common law limit on the exercise of jurisdiction. We formally adopted our jurisdictional standing test less than two decades ago. Even then, we continued to apply prudential rules, like the federal courts, to constrain judicial power when administering the federal doctrines of vagueness and overbreadth to review and potentially invalidate state laws. The result is a standing "doctrine" that combines jurisdictional requirements and prudential rules to ensure state courts both *have* jurisdiction and *should* exercise it.

A.   *Standing as distinct (non-jurisdictional) prudential and common law limits on a party's right to bring a legal claim*

Article III of the Kansas Constitution vests all judicial power exclusively in the courts and provides that district and appellate court jurisdiction shall be determined by law. Kan. Const. art. 3, §§ 1, 3, 6(b). Notably, our constitutional text lacks the express "case or controversy" limitation found in Article III of the United States Constitution. Accordingly, the early Kansas Supreme Court enjoyed broad judicial power under the Constitution, tempered by restraints on the *exercise* of that power:

31

"A court cannot determine matters not brought to its attention by some method known to the law, nor give effective judgment upon a cause or subject–matter not brought within the scope of its judicial power. *Although it may have jurisdiction in the class of cases to which a cause belongs, it cannot exercise its power until* it is invoked by the parties; and if it goes outside of the issues and adjudicates a question not submitted for its decision the judgment is without force." (Emphasis added.) *Gille v. Emmons*, 58 Kan. 118, 120, 48 P. 569 (1897) (referencing *Reynolds v. Stockton*, 140 U.S. 254, 11 S. Ct. 773, 35 L. Ed. 464 [1891], and other state supreme court decisions).

These contours loosely set forth when state judicial power *can* be constitutionally invoked—when the proper type of case comes before the court—and how it *should* be exercised—to adjudicate only issues raised by the parties.

Early Kansas courts did not use the term "standing" but instead assessed whether a plaintiff had a "special interest" or suffered a personal injury distinct from the general public. See, e.g., *Heller v. Atchison, T. & S.F.R. Co.*, 28 Kan. 625, 630-31, 1882 WL 1096 (1882) (noting owner of lots abutting public street has a "special interest" in the street different from that of the general public); *Marts v. Freeman*, 91 Kan. 106, 114, 136 P. 943 (1913) (stating general rule that plaintiff can recover private damages from public wrong if plaintiff suffered "special injuries . . . not common to the general public"); *Mobil Oil Corp. v. McHenry*, 200 Kan. 211, 243-44, 436 P.2d 982 (1968) (applying the special-interest test to determine whether a party could challenge governmental actions). This approach mirrored common law concepts and was rooted in prudential concerns rather than constitutional limitations. Indeed, the limit on private actions for public wrongs to those most directly affected is akin to the federal prudential bar on "adjudication of generalized grievances." Cf. *Allen v. Wright*, 468 U.S. 737, 750-51, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984).

Eventually, this court defined common law standing more broadly as a party's right to seek relief from a legal claim, which did not affect a court's jurisdiction. See *Moore v. Shanahan*, 207 Kan. 1, 648-49, 486 P.2d 506 (1971) ("The district court's conclusion did not go to its jurisdiction, but to the legal standing or capacity of the plaintiff to seek relief."). The court also expressed basic requirements for standing. Specifically, the party seeking relief needed to allege a "legally cognizable injury" and demonstrate "a sufficient stake in an otherwise justiciable controversy" to proceed with a claim. *Bruggeman v. Schimke*, 239 Kan. 245, 253, 718 P.2d 635 (1986) (rejecting child's claim against physician for "wrongful life" based on negligent genetic counseling); *Dutoit v. Board of Johnson County Comm'rs*, 233 Kan. 995, 1003, 667 P.2d 879 (1983) (holding plaintiffs lacked standing to challenge creation of original sewer subdistrict because the plaintiffs' property was not included in the sub-district as it was originally constituted and no assessment could have been levied against them).

Consistent with this common law requirement, Kansas courts adopted another prudential rule limiting third-party challenges of unconstitutional government action. See *Moody v. Board of County Comm'rs*, 237 Kan. 67, 69, 697 P.2d 1310 (1985) (affirming district court's conclusion of law on the "'general rule of standing'" "'that unconstitutional governmental action can only be challenged by a person directly affected and . . . cannot be made by invoking the rights of others'"). This prudential rule limited facial constitutional challenges to those involving the First Amendment. 237 Kan. at 75 (recognizing "that the [United States] Supreme Court has relaxed the traditional rules of standing to permit First Amendment attacks on statutes as overbroad") (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S. Ct. 2908, 37 L. Ed. 2d 830 [1973]).

Yet a jurisdictional basis for standing in Kansas was slow to develop and did so only after, and in reference to, corresponding developments in federal law.

B.  *Standing as a jurisdictional requirement modeled after federal constitutional standing*

1.  *Federal standing requirements*

During the 1960s and 1970s, the United States Supreme Court sought to clarify the federal justiciability doctrine. In that process, the Court distinguished between mandatory constitutional requirements arising from Article III of the United States Constitution and prudential self-governing limits that reinforce those requirements. See generally *Flast v. Cohen*, 392 U.S. 83, 97, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968); *Warth v. Seldin*, 422 U.S. 490, 498-501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) (federal standing analysis "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise").

The constitutional aspect of standing in federal court requires a party seeking relief to have "a personal stake in the outcome of the controversy." *Flast*, 392 U.S. at 99, 101 (This requirement assures the "necessary concrete adverseness" to sharpen the dispute for adjudication.) (citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 7 L. Ed. 2d 663 [1962]). The Supreme Court held that a party satisfies the "personal stake" requirement for federal constitutional standing by demonstrating an actual or threatened injury and a fairly traceable causal connection between the claimed injury and the challenged conduct. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978); *Warth*, 422 U.S. at 499. Although the Article III standing test has since been revised, the injury and causation elements remain largely the same.

In addition to Article III standing, federal courts also apply general prudential standing rules that restrict "generalized grievance" suits in which the asserted harm is shared by a large class of other citizens and "third-party" claims that involve raising

another person's legal rights or interests. *Warth*, 422 U.S. at 499-500 (discussing prudential limits on the exercise of federal jurisdiction).

2. *Kansas' jurisdictional standing test*

It appears the modern shift in Kansas toward treating standing as a distinct, jurisdictional threshold began in *Harrison v. Long*, 241 Kan. 174, 734 P.2d 1155 (1987). Echoing the federal definition and requirements for constitutional standing, the court stated:

> "Standing is a question of whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Warth []*, 422 U.S. at 498-99[]. 'Standing to sue' means that a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy. *Dutoit []*, 233 Kan. [at] 1003[]. To have standing, Dr. Long must show that he personally suffered some injury and that there was some causal connection between the claimed injury and the challenged conduct." *Harrison*, 241 Kan. at 176-77.

*Harrison* did not explicitly hold that standing is jurisdictional, but by the early 2000s, the court declared standing a component of subject matter jurisdiction distinct from that of a party's legal capacity to sue—a reversal of the previous concept for standing. See, e.g., *Mid-Continent Specialists, Inc. v. Capital Homes, L.C.*, 279 Kan. 178, 185, 106 P.3d 483 (2005); *Vorhees v. Baltazar*, 283 Kan. 389, 396-97, 153 P.3d 1227 (2007).

In *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 179 P.3d 366 (2008), the court further solidified standing as a constitutional, and thus jurisdictional, requirement. While acknowledging Kansas courts are not bound by federal justiciability requirements, the court concluded that the Kansas Constitution imposes similar limits on state judicial power as the United States Constitution imposes on federal judicial power. See 285 Kan.

at 892-98. In making this determination, the court considered the three-branch government system established by both Constitutions, analyzed the jurisdictional provisions of both texts, reviewed Kansas caselaw discussing judicial power and various justiciability requirements, and consulted numerous secondary sources. 285 Kan. at 892-98.

Rather than an express limitation, as in the federal Constitution, the court concluded that Kansas courts have derived a case-or-controversy requirement from the "separation of powers doctrine embodied in the Kansas constitutional framework." 285 Kan. at 382 (citing *NEA-Topeka, Inc. v. U.S.D. 501*, 227 Kan. 529, 531-32, 608 P.2d 920 [1980]). The court then declared the implied case-or-controversy requirement demands that "(a) parties must have standing; (b) issues cannot be moot; (c) issues must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent; and (d) issues cannot present a political question." 285 Kan. at 896 (citing Kansas caselaw). This language formally established "standing" as a constitutional requirement for state court jurisdiction.

Shortly thereafter, this court announced the modern standing test—dubbing it "the traditional test"—which requires the party seeking relief to "'demonstrate that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct.' [Citations omitted.]" *Cochran v. Kansas Dept. of Agriculture*, 291 Kan. 898, 908-09, 249 P.3d 434 (2011). Like federal Article III standing, the two-part Kansas standing test enforces the implied case-or-controversy limit on state judicial power. This test now reflects the constitutional requirement of standing for subject matter jurisdiction in Kansas courts. See *Board of Sumner County Comm'rs v. Bremby*, 286 Kan. 745, 750-51, 761, 189 P.3d 494 (2008) ("[S]tanding implicates the court's jurisdiction to hear a case.").

But to be clear, this court's recent adoption of a jurisdictional standing test did not displace long-standing prudential limits on when state courts should exercise that jurisdiction. To the contrary, Kansas courts have continued to apply prudential rules, including the general rule limiting third-party claims, particularly when administering the federal doctrines of overbreadth and vagueness. Under this established approach, a defendant raising a vagueness challenge is subject to both "traditional" jurisdictional requirements and prudential limits.

## II. *Kansas' standing "doctrine" in federal constitutional challenges includes both a jurisdictional requirement and prudential rules.*

As discussed, prudential standing limits on constitutional challenges predate our jurisdictional standing test and serve to constrain the exercise of our jurisdiction to the concrete facts presented in a particular case. These prudential rules are relaxed when broader judicial review is necessary, like when the challenged law implicates the First Amendment. Thus, a party challenging government action as unconstitutional must first satisfy our jurisdictional standing test and then may seek review consistent with traditional prudential limits given the type of challenge raised.

### A. *Jurisdictional standing in vagueness challenges*

Like every party seeking relief in state court, a defendant raising a vagueness challenge must satisfy our two-part jurisdictional standing test by demonstrating that he or she has suffered a personal injury that is causally connected to the challenged conduct. *State v. Bodine*, 313 Kan. 378, 385, 486 P.3d 551 (2021). But we have not previously explained how our jurisdictional standing test applies in this context, which has led to some confusion about what it means for a defendant to "lack standing" in a vagueness challenge. Thus, I offer the following brief explanation.

Recall that the case-or-controversy requirement, which gives rise to the federal and our state jurisdictional standing tests, requires that the party seeking relief have a "personal stake in the outcome of the controversy" to ensure the concrete adverseness of the adjudicative process. Also recall that the "injury" and "causal connection" elements are merely a way to check whether this "personal stake" requirement is met. Therefore, we must determine what it means for a defendant to have a "personal stake" in the outcome of a vagueness challenge, which will inform our view of what constitutes an "injury" and "causal connection" for this type of claim. See generally *Flast*, 392 U.S. at 101-02 ("[I]n ruling on standing, it is both appropriate and necessary to look to the substantive issues . . . to determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated.").

At first glance, it might seem that a defendant's claimed "injury" for standing is the alleged vagueness of the law and that the defendant must show a "causal connection" between vagueness and the defendant's conviction. But this gets to the merits of the vagueness challenge, and a defendant need not prove vagueness to satisfy our jurisdictional standing test. Such a ruling would mean Kansas courts do not have the constitutional power to decide a vagueness challenge unless the statute is, in fact, vague in that particular case. If that were true, defendants raising a facial challenge of laws restricting First Amendment rights could not bring a facial challenge unless the law was vague as applied to their own conduct, which is not the law. See *City of Wichita v. Griffie*, 318 Kan. 510, 516-17, 544 P.3d 776 (2024) (recognizing exception to prudential standing rule when a litigant challenges the constitutionality of a law that threatens protected speech).

Moreover, it is a basic jurisdictional principle that "standing is not defeated by failure to prevail on the merits." Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531 (3d ed.); *Warth*, 422 U.S. at 500 ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."); see, e.g., *Secretary of State of*

*Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 958-59, 104 S. Ct. 2839, 81 L. Ed. 2d 786 (1984) (determination of whether a law is "substantially overbroad" goes to the merits of the overbreadth challenge and is not a constitutional requirement for standing).

At its root, a vagueness claim presents a constitutional challenge to a criminal law. A party generally satisfies standing to challenge the constitutionality of a law by showing that the law has been or will be applied to the party. See, e.g., *Creecy v. Kansas Dept. of Revenue*, 310 Kan. 454, 461-62, 447 P.3d 959 (2019) (motorist had standing to challenge a statute that imposed a fee to receive an administrative hearing to challenge a license suspension because the motorist was subject to the statute). In a criminal case, a defendant can challenge the constitutionality of a criminal law by showing that he or she has been charged with violating that law or threatened with imminent prosecution under it. See generally Fallon, *Making Sense of Overbreadth,* 100 Yale L.J. 853, 869 (1991) (Article III standing to raise constitutional challenge satisfied by "[a] party who is charged with violating a statute or threatened with imminent prosecution" under it). Inversely, a defendant lacks standing to challenge a criminal law if that law was not applied to the defendant. See, e.g., *State v. Martinez*, 317 Kan. 151, 161, 527 P.3d 531 (2023) (defendant lacked standing to challenge statute requiring a mandatory presumption based on predicate facts that was not applied to defendant through the jury instructions).

Considering the function of the jurisdictional standing test, this relatively low bar is all that is needed to ensure the party seeking relief has a "personal stake in the controversy." There is no doubt that a party who has been charged, threatened with prosecution, or—in Stubbs' case—convicted under a statute has a "personal stake in the outcome of the controversy." Thus, the injury and causation elements of jurisdictional standing are satisfied simultaneously by a relevant criminal charge or threat of prosecution which constitutes an injury resulting from government action.

Therefore, I agree with the majority that Stubbs satisfies jurisdictional standing to challenge the criminal weapons statute. But that does not end the inquiry because—as the majority concedes—beyond verifying jurisdictional standing through our two-part test, Kansas courts have long imposed additional limits on the exercise of our jurisdiction in vagueness challenges, just like federal courts. See slip op. at 10-11.

B. *Prudential limits on vagueness challenges*

In addition to jurisdictional standing requirements, this court has adopted two limiting principles that guide our approach to constitutional challenges generally and vagueness specifically.

First, we generally require litigants to raise an as-applied challenge, which corresponds with the scope of our review. *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988) ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."); *State v. Brown*, 305 Kan. 674, 698, 387 P.3d 835 (2017) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19, 130 S. Ct. 2705, 177 L. Ed. 2d 355 [2010] ["'We consider whether a statute is vague as applied to the particular facts at issue.'"]); *Hainline v. Bond*, 250 Kan. 217, 226-27, 824 P.2d 959 (1992) (same) (citing federal cases).

Second, and in tandem with the first requirement, if there is no constitutional defect in the application of the statute to a defendant's conduct, we generally decline to analyze whether the law would be vague if applied to hypothetical facts not before the court. See *State v. Williams*, 299 Kan. 911, 918, 329 P.3d 400 (2014) (citing *Ulster County Court v. Allen*, 442 U.S. 140, 155, 99 S. Ct. 2213, 60 L. Ed. 2d 777 [1979]). This prevents a defendant from circumventing the first rule by solely raising a facial challenge

40

and is akin to finding the defendant cannot sustain an as-applied challenge, so facial review is not warranted. See generally *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982) ("A [litigant] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the [litigant's] conduct before analyzing other hypothetical applications of the law.").

Finally, as in overbreadth challenges, we relax these prudential limits when the challenged law implicates constitutionally protected activity, such as First Amendment interests. See, e.g., *City of Wichita v. Wallace*, 246 Kan. 253, 267, 280, 788 P.2d 270 (1990) (recognizing exception to prudential standing rules when litigant's vagueness challenge involved law prohibiting nude dancing which threatened protected speech and expression) (citing *Young v. American Mini Theatres*, 427 U.S. 50, 60, 96 S. Ct. 2440, 49 L. Ed. 2d 310 [1976]). As explained in *Griffie*, this exception "grew out of the notion that violations of the First Amendment impact society as a whole by exerting a chilling effect on the free and open exchange of ideas." 318 Kan. at 517 (citing *Broadrick*, 413 U.S. at 612).

Thus, we have rejected facial challenges when the defendant's conduct was clearly proscribed by the challenged law and that law does not threaten constitutionally protected activity. See, e.g., *Bodine*, 313 Kan. at 385 (defendant charged with kidnapping could not challenge statute on grounds it could be unconstitutionally applied to parents disciplining their children); *Williams*, 299 Kan. at 917-19 (defendant charged with aggravated trafficking could not challenge statute as unconstitutionally vague on grounds it could be applied to a parent transporting their minor child to a high school dance while knowing the child will engage in sexual activity); *State v. Brown*, 280 Kan. 898, 899, 127 P.3d 257 (2006) (holding defendant lacked standing to challenge the first-degree murder statute as it could hypothetically apply to state executioners who administer the death penalty);

*State v. Thompson*, 221 Kan. 165, 172, 558 P.2d 1079 (1976) (holding defendant who was charged with forcible sodomy did not have standing to challenge the sodomy statute as unconstitutionally vague against consensual homosexual acts).

Like the general prohibition on third-party claims, these prudential rules constrain judicial power to a relevant, concrete factual context and prevent advisory opinions. See generally *United States v. Raines*, 362 U.S. 17, 20-22, 80 S. Ct. 519, 4 L. Ed. 2d 524 (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined."); *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 743, 98 S. Ct. 3026, 57 L. Ed. 2d 1073 (1978) ("Invalidating any rule on the basis of its hypothetical application to situations not before the Court is 'strong medicine' to be applied 'sparingly and only as a last resort.'") (quoting *Broadrick*, 413 U.S. at 613). Together, the two-part jurisdictional standing test plus these additional prudential limits make up our standing "doctrine" in vagueness challenges.

*Application to Stubbs' case*

Relying on this precedent, the panel concluded that Stubbs lacks standing to challenge the criminal-use-of-weapons statute as vague. *Stubbs*, 2023 WL 4284639, at *3. To the extent the panel relied on our jurisdictional standing test to find Stubbs lacks standing, the panel was incorrect. As discussed, Stubbs satisfies that test on the basis of his conviction. But under our existing standing doctrine, I would not reach the merits in this case because Stubbs expressly raises a facial vagueness challenge, and his conduct is clearly proscribed by the statute. In other words, traditional prudential limits deter Stubbs' facial challenge, and there is no cause to relax those limits here, despite the majority's postulations otherwise.

To review, K.S.A. 21-6301(a)(2) prohibits the criminal use of weapons by "knowingly" "possessing with intent to use the same unlawfully against another, a dagger, dirk, billy, blackjack, slungshot, *dangerous knife*, straight-edged razor, throwing star, stiletto or any other dangerous or deadly weapon or instrument of like character." (Emphasis added.) Merriam-Webster defines "dangerous" as "able or likely to inflict injury or harm." Merriam-Webster Online Dictionary (https://www.merriam-webster.com/dictionary/dangerous). This definition is consistent with Kansas caselaw interpreting the statutory phrase "dangerous knife" to mean a knife "that is likely to produce death or serious injury when used as a weapon." See, e.g., *State v. Sanders*, 263 Kan. 317, 330, 949 P.2d 1084 (1997) (holding jury could reasonably infer a knife taken from a kitchen and used in an attack fit the definition of a "dangerous knife"); *State v. Moore*, 38 Kan. App. 2d 980, 986, 174 P.3d 899 (2008) (holding a dangerous knife is one "'that is likely to produce death or serious injury when used as a weapon'"). Thus, a dangerous knife within the context of K.S.A. 21-6301(a)(2) means one "that is likely to produce death or serious injury when used as a weapon."

The undisputed evidence at trial was that the knife Stubbs possessed and used to stab Edward McCutcheon caused a wound that required emergency medical treatment and surgery. *Stubbs*, 2023 WL 4284639, at *1. Therefore, the knife in this case was used as a weapon and was clearly capable of causing serious bodily harm since it actually did so. Whatever doubt may arise in applying the term "dangerous knife" to a hypothetical knife, there is no doubt that the knife Stubbs possessed was, in fact, dangerous. Therefore, Stubbs' conduct falls squarely within the statute's core prohibition and his facial vagueness challenge should be rejected on this basis, consistent with our precedent.

Yet the majority ignores our established approach to vagueness challenges and claims we should automatically consider the merits of facial challenges, at least when the defendant brings an arbitrary enforcement claim as Stubbs does here. Eschewing the "doctrinal questions" that would inform a real inquiry of our standing approach in this

43

substantive area of law, the majority declares that "the constitutional underpinnings of arbitrary-enforcement challenges," upon which Stubbs' vagueness challenge is based, "render these prudential standing constraints inapplicable." Slip op. at 12.

To justify this departure from our precedent, the majority attempts to shift the constitutional underpinnings of the vagueness doctrine from due process to separation of powers. But its rationale is based on a questionable interpretation of substantive vagueness law. Nor does the majority explain how this new bifurcated vagueness test—which would encompass a *federal* due process prong and a *state* separation of powers prong—will work in practice. I explore these issues next.

III. *The federal vagueness doctrine is a due process safeguard to check for violations of the Fifth and Fourteenth Amendments.*

A law is impermissibly vague when it either fails to provide adequate notice of what conduct is prohibited or fails to guard against arbitrary or discriminatory enforcement. *State v. Valdiviezo-Martinez*, 313 Kan. 614, 630-32, 486 P.3d 1256 (2021). Stubbs explicitly and exclusively raises a facial challenge to the criminal-use-of-weapons statute under the arbitrary enforcement prong of the vagueness test. Thus, he asks this court to ignore whether the statute clearly prohibits his conduct and instead consider in the abstract or hypothetical case whether it fails to provide "an explicit and objective standard of enforcement" to guard against arbitrary enforcement by government officials. Despite our decades of precedent rejecting facial challenges just like this one, the majority takes up Stubbs' claim on grounds that the separation of powers doctrine requires us to do so. See slip op. at 13. But as demonstrated by a large body of Kansas and federal caselaw, the vagueness doctrine's underlying principles are firmly rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments, not the separation of powers.

44

Kansas courts have long recognized the vagueness test as "a commonsense determination of fundamental fairness" under principles of due process. *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977); *State v. Rose*, 234 Kan. 1044, 1045, 677 P.2d 1011 (1984); see also *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 (1983); *Hearn v. City of Overland Park*, 244 Kan. 638, 642, 772 P.2d 758 (1989); *State v. Adams*, 254 Kan. 436, 445, 866 P.2d 1017 (1994); *State v. Richardson*, 289 Kan. 118, 124, 209 P.3d 696 (2009); *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015).

Recently, in *State v. Harris*, 311 Kan. 816, 821, 467 P.3d 504 (2020), this court expressed the arbitrary-enforcement prong of the vagueness test in separation-of-powers terms. However, an expanded awareness of the theoretical underpinnings of vagueness is not cause to modify our practical approach to vagueness claims. See *Johnson v. United States*, 576 U.S. 591, 623, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015) (Thomas, J., concurring) (reviewing historical authority discussing competing theories of due process, one of which traces due process to an early conception of the separation of powers doctrine). Regardless of the historical origins of due process, which legal scholars may debate, there is no state or legal precedent for transforming the vagueness doctrine into a separation of powers mechanism, and for good reason. While the vagueness test is well-designed to identify a due process injury to an individual (or group) subject to a law, it is poorly suited for discerning structural constitutional violations. To that end, we already have a framework for identifying separation of powers violations that is appropriately robust to ensure courts do not exceed our own authority to "check" the other branches. See *Morrison*, 285 Kan. at 883-84 (listing extensive factors to consider when analyzing an alleged separation of powers violation).

And contrary to its claim, the federal caselaw relied on by the majority does not support shifting the doctrinal underpinnings of the vagueness test from a due process safeguard to a separation of powers mechanism. Far from it. Rather than signifying a new approach to vagueness challenges by permitting facial challenges under the arbitrary-

45

enforcement prong, the United States Supreme Court decisions cited represent exceptions when prudential limits are relaxed that do not apply here, specifically (1) challenges to criminal laws restricting constitutionally protected activity that lack a mens rea and (2) challenges to laws that require courts to impose penalties using a "categorical approach" to assess an underlying offense, instead of case-specific facts. In both situations, the Court relaxed prudential limits on facial challenges but still relied on the Due Process Clause to invalidate the challenged laws, including when analyzing vagueness under the arbitrary-enforcement prong of the test. And despite these noted exceptions, federal courts continue to uphold prudential limits barring facial vagueness challenges when the defendant's conduct was clearly proscribed by the challenged law.

A. *Exception for facial attacks of criminal laws that restrict constitutionally protected activity, other than speech, and lack a mens rea*

The majority improperly relies on *Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983), and *City of Chicago v. Morales*, 527 U.S. 41, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999), to support its contention that the Supreme Court relaxes prudential limits to permit facial review of *any* arbitrary-enforcement claim and no longer requires a defendant to show the law is vague as applied to his or her conduct. In fact, both cases involved vagueness challenges to laws that restricted constitutional rights and lacked a mens rea requirement—features the Court made clear were key to its decision to conduct facial review in these cases and which do not apply in Stubbs' case.

In *Kolender*, the Court permitted a facial attack of a "stop-and-identify" statute requiring "persons who loiter or wander on the streets to provide a 'credible and reliable' identification and to account for their presence when requested" by police under circumstances that would justify a "*Terry* stop." 461 U.S. at 353 (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]). The Court announced its facial review was in the context of statutory restrictions on constitutional rights and stressed:

"Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty. Statutory limitations on those freedoms are examined for substantive authority and content as well as for definiteness or certainty of expression." 461 U.S. at 357. *Kolender* therefore stands for the proposition that facial review of a vagueness challenge is appropriate, not only in First Amendment challenges, but also when the challenged law threatens other constitutionally protected activity, like freedom of movement. 461 U.S. at 358-59.

Over a decade later in *Morales*, the Court struck down a loitering ordinance that restricted the inverse right to remain in one place. The ordinance sought to deter criminal street gang operations by prohibiting suspected gang members and anyone associating with them from "loitering" in a public place. 527 U.S. at 45-46. A violation occurred when a police officer ordered a person found loitering, defined as "'remain[ing] in any one place with no apparent purpose,'" to disperse and the person disobeyed the order. 527 U.S. at 47. In setting out the scope of review, the Court explained facial review was appropriate "[w]hen vagueness permeates the text of [] a [criminal] law" that "infringes on constitutionally protected rights" and "contains no mens rea requirement." 527 U.S. at 55. The protected interest at stake was the right to remain in one place for innocent purposes. 527 U.S. at 53-54. Finding the law restricted a "substantial amount of innocent conduct" by its broad and indefinite language, the Court held it violated both prongs of the vagueness test. 527 U.S. at 53-54, 60, 64 ("[I]n this instance the city has enacted an ordinance that affords too much discretion to the police and too little notice to citizens who wish to use the public streets.").

Although *Kolender* and *Morales* both involved facial vagueness challenges under the arbitrary-enforcement prong, the Court did not base its approach on this aspect of the vagueness test or on the risk of a separation of powers violation. Rather, in both cases, the Court defined the vagueness test in terms of due process and conducted facial review

because the challenged laws implicated a constitutional right. By contrast, the criminal-use-of-weapons statute at issue in Stubbs' case does not threaten constitutionally protected activity since it prohibits possession of a weapon with an intent to use that weapon unlawfully against another. See K.S.A. 21-6301(a)(2). Thus, *Kolender* and *Morales* do not support the majority's decision to reach the merits of his facial challenge.

B. *Exception for facial attack of laws that require a categorial approach to imposing penalties and prove unworkable by judicial experience*

The majority relies on two other Supreme Court decisions that do not support its analysis, *Sessions v. Dimaya*, 584 U.S. 148, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018) (plurality opinion), and *United States v. Davis*, 588 U.S. 445, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (2019). In both cases, the Court invalidated statutory residual clauses that required federal courts to decide whether to impose criminal and civil penalties based on the abstract "ordinary case," while ignoring the case-specific facts at hand.

*Dimaya* involved a facial challenge to a residual clause incorporated into the Immigration and Nationality Act which rendered an illegal immigrant deportable for an "aggravated felony" conviction. Courts were to decide whether a defendant immigrant's offense qualified for deportation by considering whether it *generally* involved a substantial risk of physical force, ignoring the particular facts of the defendant's conviction. 584 U.S. at 152-55. In a plurality opinion authored by Justice Kagan and joined by three other justices, the Court noted that the vagueness doctrine's protection against arbitrary or discriminatory law enforcement is a "corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." 584 U.S. at 156; see also 584 U.S. at 182 (Gorsuch, J., concurring in part) ("[V]ague laws risk allowing judges to assume legislative power. Vague laws also threaten to transfer legislative power to police and

48

prosecutors, leaving to them the job of shaping a vague statute's contours through their enforcement decisions."). Although noting this overlap, the Court ultimately went on to hold the residual clause "'produces more unpredictability and arbitrariness than the Due Process Clause tolerates.'" 584 U.S. at 175.

A year later, in *Davis*, the Court took on a facial vagueness challenge of a federal sentencing statute's residual clause authorizing an upward departure for using, carrying, or possessing a firearm in connection with the commission of a federal "crime of violence." *Davis*, 588 U.S. at 449, 470. Nearly identical to the previously invalidated residual clause in *Dimaya*, the residual clause in *Davis* permitted courts to determine whether the charged offense involved a substantial risk that physical force was used against a person or property. 588 U.S. at 449. Writing for a five-justice majority, Justice Gorsuch cited *Dimaya* to reiterate the fundamental importance of clear legal definitions to uphold due process and maintain the proper balance of power among the branches of government. 588 U.S. at 451. The Court's discussion of separation of powers principles in the context of arbitrary enforcement is brief and essentially boils down to acknowledging the "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." 588 U.S. at 451. Still, the decision relied heavily on prior decisions that invalidated the challenged residual clauses solely under the Due Process Clause.

Importantly, the Court's decision to review these federal residual clauses was not based on separation of powers. Because the statutory text mandated a "categorical approach" to assess whether a violation occurred instead of relying on the concrete facts in a given case, these residual clauses frustrated as-applied review. Facial review was also warranted by judicial experience seeking to apply these laws which left no doubt that they "could not be applied with the predictability the Constitution demands." *Dimaya*,

584 U.S. at 174 (citing *Johnson*, 576 U.S. at 605 [facial review and invalidation are appropriate when "the experience of the federal courts leaves no doubt about the unavoidable uncertainty and arbitrariness of adjudication under the residual clause"]).

By contrast here, the phrase "dangerous knife" in the criminal-use-of-weapons statute poses no such issues—it is not part of a residual clause, it does not require a "categorical approach" to assess a violation of the statute, and it has not proved unworkable as a standard. Thus, *Dimaya* and *Davis* do not support the majority's decision to reach Stubbs' facial challenge here.

   C.  *Federal courts continue to uphold prudential limits barring facial vagueness challenges when the defendant's conduct was clearly proscribed by the challenged law.*

Despite conducting facial review in these exceptional cases, the United States Supreme Court and lower federal courts continue to apply the prudential limit on facial vagueness challenges when the claimant's conduct is clearly proscribed by the challenged law. See, e.g., *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 48-49, 137 S. Ct. 1144, 197 L. Ed. 2d 442 (2017) (rejecting business owners' facial vagueness challenge of a state law banning differential pricing of customers paying with a credit card versus cash on standing grounds because the law clearly prohibited petitioners' conduct); *United States v. Hasson*, 26 F.4th 610, 620-21 (4th Cir. 2022) (rejecting defendant's facial vagueness challenge of federal statute prohibiting possession of firearms by person who is an unlawful user of or addicted to any controlled substance because defendant's alleged conduct fell squarely within statute's confines); *United States v. Cook*, 970 F.3d 866, 874, 877 (7th Cir. 2020) ("Whatever doubt there might be at the margins as to conduct potentially reached" by the challenged law, there was no doubt that the "core of conduct" proscribed applied to the defendant's conduct.); *Kashem v. Barr*, 941 F.3d 358, 376 (9th Cir. 2019) ("[W]e are not persuaded by plaintiffs' contention that we may cast aside the longstanding rule that a litigant whose conduct is clearly prohibited by a statute cannot be

the one to make a facial vagueness challenge."); *Bowling v. McDonough*, 38 F.4th 1051, 1061-62 (Fed. Cir. 2022) (same); *United States v. Davey*, No. 23-20006-01-DDC, 2024 WL 340763, at *10 (D. Kan. 2024) (unpublished opinion) (rejecting facial challenge of statute prohibiting a user or addict of controlled substances from possessing a firearm when defendant admitted to using heroin on daily basis).

Perhaps mistakenly, the majority cites an analogous example as persuasive authority, *Copeland v. Vance*, 893 F.3d 101 (2d Cir. 2018), which actually rebuts the majority's rationale for jettisoning prudential standing limits. See slip op. at 14. As in *Stubbs*, the *Copeland* plaintiffs sought to raise a facial vagueness challenge to a "knife" statute without first showing that the statute was vague *as applied* to them. But unlike here, the Second Circuit rejected those facial challenges outright.

The plaintiffs in *Copeland* were all charged under a state statute prohibiting "folding knives" that open with a single flick of the wrist. They challenged the statute as vague, claiming they could not determine which knives were legal to carry or sell due to the statute's indefinite language. 893 F.3d at 107-09. Before addressing the merits of the plaintiffs' facial vagueness challenge, the court made clear the plaintiffs first needed to show the law was vague "*as applied to them* in the [disputed] enforcement actions." (Emphasis added.) 893 F.3d at 113. Contrary to the majority's claim here that a challenger "need not allege that officials actually enforced the statute arbitrarily in their case," that is exactly what the *Copeland* court held: "If a court concludes that a statute was constitutionally applied to a facial challenger, then it generally need not consider the statute's applicability in other situations." 893 F.3d. at 111; see slip op. at 14.

In sum, none of the federal decisions the majority relies upon support its rationale for expanding facial review to every arbitrary enforcement challenge.

IV. *Implications of the majority's decision*

Today's decision has far-reaching consequences beyond this case. Without explanation, the majority abandons our long-standing approach to vagueness challenges, which is grounded in principles of judicial restraint, supported by many decades of precedent, and currently aligns with federal vagueness law—a federal doctrine. In doing so, the majority trades judicial prudence for overreach which, I predict, will transform our courts into roving statutory-review commissions. The United States Supreme Court and Kansas courts have consistently held that the injury in an arbitrary enforcement vagueness challenge arises from how a law is applied, not merely from its enactment. The majority's theory—construing every vague statute as an unconstitutional delegation of power the moment it is enacted—turns this doctrine on its head. It divorces vagueness challenges from their due process foundations and opens the floodgates to abstract, advisory litigation.

The majority's rationale for this departure from our precedent is especially troubling given its questionable basis in the law and lack of regard for the broader implications of this decision—essential considerations under our stare decisis framework which the majority ignores. "The doctrine of stare decisis recognizes that 'once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised.'" *McCullough v. Wilson*, 308 Kan. 1025, 1032, 426 P.3d 494 (2018). This court should not "lightly disapprove of precedent" because "adherence to precedent promotes the systemic stability of our legal system." *State v. Spencer Gifts*, 304 Kan. 755, 766, 374 P.3d 680 (2016). While "stare decisis is not an inexorable command," this court endeavors to adhere to the principle unless clearly convinced a rule of law established in its earlier cases "'was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.'" 304

Kan. at 766. Departing from our legally sound and well-established due process analysis in vagueness challenges, including arbitrary enforcement claims, is unjustified and will do more harm than good.

In the end, the majority does not explain why the well-recognized due process "constitutional underpinnings" of the vagueness test are no longer sound or why the vagueness test should function as a distinct separation-of-powers mechanism when this type of claim can already be raised—under federal and state law—independently of a vagueness claim. See *Blue Cross and Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 276, 75 P.3d 226 (2003) (state nondelegation claim); slip op. at 12. Cf. *Bond v. United States*, 572 U.S. 844, 853, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014) (Tenth Amendment federalism claim).

There is also the issue of how to constitutionally apply the vagueness test this way. The majority appears to miss an important effect of its decision: it bifurcates the vagueness test into a *federal* due process prong and a *state* separation of powers prong. Let's take Stubbs' case as an example. He challenges a state criminal statute. If he had challenged it under the entire vagueness test, the majority's new approach would require a court to determine whether the statute is vague under the Due Process Clause of Fifth and Fourteenth Amendments and/or vague as a violation of the state separation of powers doctrine. This adds unnecessary complexity for seemingly no benefit. Not to mention that it remains unclear how a federal doctrine like vagueness can test for a state violation of the separation of powers. But that is exactly what the majority suggests we do going forward.

While the separation of powers doctrine has been well-developed in administrative law and other areas of constitutional law, there is no state or federal legal precedent for using the vagueness doctrine in a similar way to assess separation of powers violations by run-of-the-mill criminal laws. Yet the majority offers no framework for using the

vagueness test to check for a violation of separation of powers other than the vagueness test itself. Ironically, in its effort to ensure the legislative branch does not improperly delegate its powers by passing a vague law, the majority completely eliminates traditional restraints on judicial power in constitutional challenges, such as prudential limits on facial challenges and the presumption of constitutionality of duly passed laws—which itself are a critical component of our existing separation of powers framework. The concerning consequence is that, from now on, every criminal defendant can contest their conviction by challenging the specificity of the law, not as applied to the concrete facts of the case at hand, but in the abstract, hypothetical world.

The majority states it "cannot accept the dissent's policy rationale for denying review based on prudential concerns" because "[w]hen citizens properly invoke our jurisdiction to address claims of unconstitutional treatment, they deserve to have those claims heard on the merits. Courts have a duty to consider such claims, not to close the courthouse door through discretionary barriers." Slip op. at 20. But the majority misunderstands the function of our precedential prudential rules in vagueness challenges. These rules do not prevent litigants from having their claims heard on the merits. Rather, prudential rules limit the scope of review to as-applied vagueness challenges unless constitutional implications warrant wider judicial review by a facial challenge. Stubbs can be heard on an as-applied challenge, but that is not what he raised here. The policy rationale for our existing prudential rules that deny wider judicial review in a facial challenge—which the majority expressly rejects—is fundamental to our basic respect for the constitutionally mandated separation of powers between our three branches of government. See *Glaze v. J.K. Williams*, 309 Kan. 562, 567-68, 439 P.3d 920 (2019) (explaining this court's efforts "to introduce more discipline into our frequent tasks of statutory interpretation" which requires the court to "deliberately" stick to a "disciplined path . . . because it advances embedded values of judicial restraint and modesty and preserves respect for separation of powers and institutional competency").

For all of these reasons, I would adhere to precedent and continue to analyze the arbitrary enforcement component of the vagueness doctrine as a due process safeguard; preserve our existing standing doctrine in vagueness challenges, including our longstanding practice of placing prudential limits on the exercise of our jurisdiction; and reject Stubbs' facial arbitrary enforcement claim because his conduct was clearly prohibited by the criminal-use-of-weapons statute.